# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MARIO TORRES,                                           CV F   04-6254 OWW DLB HC

               Petitioner,                    FINDINGS AND RECOMMENDATIONS
                                                        REGARDING SECOND AMENDED
    v.                                                PETITION FOR WRIT OF HABEAS CORPUS

                                                        [Doc. 14]
EDWARD S. ALAMEDA, JR.,

               Respondent.

_____/

       Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## PROCEDURAL BACKGROUND

       On August 2, 2002, in the Stanislaus County Superior Court, Petitioner was found guilty by jury of first degree murder (Cal. Pen. Code[1] § 187, subd. (a); Count I) and misdemeanor child endangerment, a lesser included offense of the crime charged in Count II.[2]  The jury also found that Petitioner had personally used a knife in the commission of the murder (§ 12022, subd. (b)). (CT 213-216.)  Outside of the jury's presence, Petitioner admitted that he had previously been convicted of a "serious" felony (§§ 667, subd. (a), (d); 1192.7, subd. (c)) and that he had served a prior separate term in state prison (§ 667.5, subd. (b)).  (CT 213.)

---

[1]  All further statutory references are to the California Penal Code unless otherwise indicated.

[2]  In Count II, Petitioner had been charged with felony child endangerment under circumstances likely to cause great bodily injury or death.  (§ 273, subd. (a)).  (CT 216.)

1

1    Petitioner was sentenced to a term of 56 years as follows: 25 years to life on Count I,

2    doubled pursuant to section 667, subdivision (e)(1); plus one year, consecutive, for the

3    enhancement pursuant to section 12022, subdivision (b); plus five years, consecutive, for the

4    prior "strike" conviction.  (CT 233-235.)  A restitution fine of $10,000 was also imposed.  (CT

5    235.)

6    Petitioner filed a timely notice of appeal to the California Court of Appeal, Fifth

7    Appellate District, on August 27, 2002.  (CT 236.)  On November 10, 2003, the Court of Appeal

8    affirmed the judgment and sentence.  (Respondent's Exhibit A, attached to Answer.)

9    On November 19, 2003, Petitioner's petition for rehearing was denied.[3]  (Respondent's

10   Exhibit B.)

11   On December 3, 2003, Petitioner filed a petition for review in the California Supreme

12   Court.  (Respondent's Exhibit C.)  The petition was denied on January 28, 2004.[4]

13   Petitioner filed the instant action on September 7, 2004.  On February 9, 2005, Petitioner

14   filed a second amended petition for writ of habeas corpus of which the instant action is

15   proceeding.  (Court Doc. 14.)

16   On June 6, 2005, Respondent filed an answer to the second amended petition for writ of

17   habeas corpus.  On August 10, 2005, Petitioner filed a traverse, and pursuant to this Court's order

18   of November 15, 2005, Petitioner's renewed motion for discovery, filed September 14, 2005, is

19   construed and reviewed as a supplement to Petitioner's traverse.  (Court Docs. 33, 34.)

20                                        STATEMENT OF FACTS

21   Prosecution Case in Chief

22   At the time of the instant crime, Mario Torres [Petitioner] had been a tumultuous

23   relationship with Shelly Rodriguez for approximately four years.  (RT 51-52.)  The relationship

24   began when Petitioner was approximately 36 years old and Ms. Rodriguez was 17 years old.  (RT

25

26        [3] A copy of this order is appended to the second amended petition for writ of habeas corpus filed in this
     Court.  (Court Doc. 14.)

27

28        [4] A copy of this order is appended to the second amended petition for writ of habeas corpus filed in this
     Court.  (Court Doc. 14.)

1   52.)  Ms. Rodriguez mothered a son, Frankie, by another man, during a time when Petitioner was

2   incarcerated.  (RT 51, 54-55.)  Ms. Rodriguez subsequently had a daughter, Rebecca, with

3   Petitioner during the Spring of 2000.  (RT 50-51, 55, 75.)

4        During the time that Ms. Rodriguez was dating Petitioner, she lived with her mother,

5   Delores Maldonado.  Petitioner would periodically go to Ms. Maldonado's home to stay with Ms.

6   Rodriguez and when he did so, Ms. Maldonado would go stay at her daughter Samantha's house

7   because she "didn't approve of [their relationship]."  (RT 54, 56.)  It was Ms. Maldonado's

8   opinion that Petitioner acted like Ms. Rodriguez's father.  (RT 57.)

9        On July 10, 2001, there was evidence that Petitioner went to the Empire Liquor Store at

10  5018 Yosemite Boulevard at approximately 1:00 p.m., with his daughter Rebecca.[5]  (RT 118-

11  123, 131, 323.)  Petitioner made a purchase and the cashier noticed that Petitioner was wearing a

12  folding knife on his belt.  (RT 127.)

13       Neighbor Ryan Mayberry testified that on July 10, 2001, he went to visit Ms. Rodriguez

14  at her home at approximately 12:45 p.m.  (RT 134.)  He observed Petitioner wearing a burgundy

15  folding knife clipped to his belt and a 12-inch knife sticking out of one of the pockets of his

16  pants.  (RT 137-138, 146.)  Mr. Mayberry testified that Ms. Rodriguez was getting ready to take a

17  shower and he went across the street to his home to get some garbage bags.  (RT 134-135.)  As

18  Mayberry was walking out the door, Petitioner gave him a "dirty look" and then slammed the

19  door shut.  (RT 135-136.)

20       Kenneth Wooding, who owns a board-and-care home near Rodriguez's home, heard loud

21  voices from inside Rodriguez's home that afternoon but he could not understand what was said.

22  (RT 236-239, 244.)

23       Neighbor Curtis Mayo observed Rodriguez run out of her home with her baby in her arms

24  and she "just plopped down on the ground with the baby in her hand."  (RT 101.)  Petitioner then

25  came out of the house and placed a pillow over Rodriguez's chest and picked up the baby.  (RT

26  103-104, 108-109, 112, 116.)  Petitioner yelled for Mayo to call 911.  (RT 104, 109, 116.)  Mayo

27

28       [5]  A surveillance video from the store was admitted into evidence as Exhibit No. 9; the video was played for the jury.  (RT 124, 468.)

3

heard Petitioner tell Rodriguez, "Please don't die."  (RT 109, 112.)  Mr. Mayo proceeded home

on his bicycle and told his brother to call 911.  (RT 106, 111.)

Neighbors Steve Garcia and Terra Britt heard Petitioner yelling for someone to call 911.

(RT 156, 163-164, 166, 168, 173-174, 184-185.)   A few minutes later, Petitioner walked over to

Garcia's residence and asked for a cigarette then walked off.  (RT 157, 167, 175-176, 186-187.)

Petitioner did not respond when Ms. Britt asked him what happened.  (RT 175, 177, 187.)

Neighbor Michelle Knoll testified that she saw Petitioner kicking at Rodriguez as she was

laying on the ground.  (RT 192.)  Knoll stated that she was standing at her kitchen window

washing dishes when she made the observation.  (RT 193.)  After the ambulance arrived, Knoll

asked Petitioner what happened and he said something to the effect of "Frankie, I think the

drainpipe."  (RT 200, 211.)  Knoll stated that Rodriguez "didn't even look alive.  Her eyeballs

were still open and, like, dilated-looking."  (RT 197.)

Tamara McLain also spoke to Petitioner after the incident occurred and asked him what

happened, he just shrugged.  (RT 410.)

At approximately 1:45 p.m. on July 10, 2001, Dennis Jackson and Brad Moore, firemen

for the Stanislaus County Fire District, were dispatched to a call at 225 South Abbie in response

to a woman laying on the ground.  (RT 78-80.)  When they arrived at the scene, Jackson observed

Rodriguez "laying on the ground in obvious pain."  (RT 80.)  She was having difficulty breathing

and he was unable to get a reading of her blood pressure.  (RT 81-82.)  Rodriguez was unable to

answer the questions posed to her.  (RT 83.)

Mr. Jackson asked a Hispanic man who was standing nearby holding a baby what

happened, and he responded that Rodriguez had been stabbed.  (RT 87.)  Jackson observed what

appeared to a stab wound on Rodriguez's left side.  (RT 84.)

An ambulance arrived on the scene a minute or so after the firemen and Rodriguez was

loaded onto a gurney and taken to Memorial Hospital.  (RT 88, 215-222.)

While in the ambulance and en route to the hospital, emergency medical technician,

Susan Decker, was attempting to talk with Rodriguez.  (RT 218-219.)  Ms. Decker asked

Rodriguez who did this to her, and she responded that "Mario did it."  (RT 90, 221.)  When

4

1   Decker asked why he would do such a thing, Rodriguez stated, "He told me he was going to kill

2   me." (RT 221.) As the ambulance was approaching the hospital, Rodriguez told Decker to tell

3   her mother that she loved her. (RT 222.)

4        Stanislaus County Deputy Sheriff Marcelona Nuno arrived at the scene of the crime just

5   as Rodriguez was being placed into the ambulance. (RT 247-248.) Deputy Nuno located

6   Petitioner and asked him what happened, he said "his girlfriend had came [sic] out from the back

7   bedroom of the residence and had collapsed in the living room." (RT 250.) Petitioner denied

8   any knowledge of who stabbed Rodriguez. (RT 252.)

9        Ms. Maldonado's residence was searched by Sheriff's Deputies. (RT 280-307.) Deputies

10  located a pocket knife in a CD case in Rodriguez's living room. (RT 285-286, 294.) A half-pair

11  of pruning shears were located in one of bedrooms. (RT 291.) In another bedroom, Deputies

12  located a possible blood stains on a crib, a screwdriver, a black laced boot, a baby bottle cap, a

13  wood handled knife, a beer can, and papers. (RT 296-299, 317.) The Deputies did not find a

14  folding knife or sheath in the house or attic. (RT 289, 307.) There was also burnt aluminum foil

15  and a straw in the bathroom, indicative of narcotics use. (RT 315.)

16       Narcotics Detective Priscilla Woods interviewed Petitioner at the Sheriff's Department on

17  the afternoon of July 10, 2001. (RT 325-332.) She testified that Petitioner did not manifest any

18  symptoms of being under the influence of a controlled substance, particularly, methamphetamine.

19  (RT 326-329.) Detective Woods acknowledged that a person who has taken methamphetamine

20  for a couple of days straight will experience a massive crash afterward unless he or she takes

21  more drugs. (RT 342.)

22       During the interview, Petitioner advised Detective Wood that he had already told another

23  Deputy what happened. Specifically, he went to the store and when he returned he found Ms.

24  Rodriguez like that. (RT 331.) Petitioner also stated that he was supposed to turn himself in to

25  authorities that day because he had thrown a pan at Rodriguez but it did not hit her. (RT 331-

26  332.)

27       An autopsy report was performed on Rodriguez's body on July 11, 2001. (RT 350-366.)

28  The examining pathologist observed that Petitioner had several contusions and abrasions on her

arms and upper body.  (RT 352-353, 359-360.)  Rodriguez also had three stab wounds.  (RT 354-355.)  The first stab wound was located on her left shoulder, which went through the skin less than an inch and did not cut the bone.  (RT 354.)  The second stab wound was located on her left back towards the side.  It entered through the skin and between the ribs, with no injury to the lung.  (RT 354-355.)  The third and fatal stab wound went from front to back and left to right.  It cut the lung and into the heart causing a fatal injury to the heart.  (RT 355.)

Propensity Evidence

On January 17, 2001, Stanislaus County Sheriff's Deputies Daniel Maez and Patrick McCulloch went to the Rodriguez's residence in response to a report of vandalism.  (RT 455-456, 460-462.)  Rodriguez was upset and stated that her and Petitioner had an argument. Rodriguez told Deputy McCulloch that Petitioner threw a hot pan of food off the stove during the argument.  The pan did not hit Rodriguez.  (RT 462, 465.)  Rodriguez stated that she told Petitioner she was going to call the police and he told her "that, if she called the police, he would cut the phone line and then cut her."  (RT 462-463, 465-466.)  Deputy Maez observed that the phone lines had been cut.  (RT 456.)  Petitioner was prosecuted for assault as a result of this incident and pled guilty to misdemeanor assault.  (RT 494-496, 512-513, 582.)

Tamara McLain was a friend of Ms. Rodriguez.[6]  (RT 387-388.)  One day in April or May, 2001, Ms. McLain observed Rodriguez throw a beer can at Petitioner after Petitioner said that Rodriguez's son Frankie was illegitimate.  (RT 390.)  Petitioner ducked and the beer can hit the floor.  Rodriguez then grabbed a can of pepper spray and threw it at Petitioner when it did not work.  (RT 390, 392-393, 413.)  Petitioner then chased Rodriguez back into the house with a crescent wrench.  She slammed the door and locked it.  (RT 390.)  Rodriguez did not report this incident to the police.  (RT 407.)

On May 9, 2001, Deputy Williams responded to a vandalism complaint made by Rodriguez.  (RT 433.)  Rodriguez told Deputy Williams that the windshield of her car had been busted the night before and that she suspected that Petitioner had done it, yet she did not see.

---

[6] Ms. McLain admitted that she was convicted of selling methamphetamine in 1994.  (RT 407.)

(RT 437, 442.)  During the day, Rodriguez saw Petitioner walking by and yelled out calling him names. (RT 437, 443.)  An argument ensued.  (RT 437, 443.)  Petitioner stabbed Rodriguez's car speakers with a screwdriver.  (RT 437-438, 443.)  Ms. McLain observed Petitioner "stab" the speakers three times.  (RT 399-400.)  McLain testified that Petitioner picked up an unopened can of beer and threw it at Rodriguez, hitting her in the shoulder.  (RT 400.)  As McLain proceeded to go home, she heard Rodriguez state that she was going to call the police.  (RT 398, 401.)

_____Petitioner told Deputy Williams that Rodriguez punched him with a beer can, then threw a beer can at him.  (RT 434, 441-442, 450-451.)  Petitioner did not want to press charges against Rodriguez.  (RT 442.)  Petitioner admitted to Deputy Williams that he stabbed the stereo speakers because he was upset at Rodriguez for calling him names.  (RT 447.)

On an unspecified date in June or July of 2001, after the speaker incident, Rodriguez went to McLain's residence one night around 1:30 or 2 a.m. complaining that Petitioner had struck her in the back with a syringe.  There was a small scratch on her back shoulder blade area.  This incident was not reported to the police.  (RT 403-406, 415-416, 426-428.)

Defense

Petitioner testified in his own defense.  Petitioner began a dating "on and off" relationship with Ms. Rodriguez in 1996.  (RT 470.)  They had a daughter, named Rebecca, who was born in April 2000.  (RT 470.)

Petitioner moved in with Rodriguez in January 2001, at Building A, 225 South Abbie Street, the location that the instant crime occurred.  Petitioner stated that things were calm "for a couple of weeks and [then] we started arguing."  (RT 471.)  Petitioner stated the arguments were because when he would come home from work the house was always dirty with dirty dishes, clothes, and toys scattered all over.  (RT 471-472, 580-581.)  Petitioner was also upset about the continual methamphetamine trafficking going on at Rodriguez's home.  (RT 490, 569-571, 573, 596-597.)

On January 17, 2001, Petitioner stated that he was awakened to Rebecca crying in her crib, he asked Rodriguez to make the baby a bottle because she was already awake and was preparing some food for herself and her son, Frankie.  (RT 472-473.)  Petitioner stated that

7

Rodriguez stated, "Why don't you get the fuck up and get it yourself." (RT 473, 580.) Petitioner proceeded to ask Rodriguez two or three times to make a bottle and every response was hostile. (RT 473-474.) Petitioner got upset and knocked the pan of soup off the stove and told Rodriguez, "The hell with this. You don't want to help me. I'm going to leave." (RT 475.) Petitioner left and as he was leaving he cut the phone line. (RT 476-478.) He cut the phone line because it was in his name and he did not want Rodriguez to run up the phone bill. (RT 478.)

On the afternoon of January 17, 2001, Rodriguez went to Petitioner's mother's home and gave him $50 for some car repairs he had done. (RT 479.) Petitioner stated he was mad and stressed out then went to a connection and bought a bag of heroin. (RT 479.)

Petitioner then went back to Rodriguez's residence a couple days later. Rodriguez informed Petitioner that she had called the police regarding the pan incident. (RT 480.) Rodriguez told Petitioner an arrest warrant was not issued because he did not physically touch her. (RT 480.)

In mid-February 2001, Rodriguez told Petitioner the two should separate because of all the arguing. (RT 481.) Petitioner then went to Modesto to stay with a friend and fellow heroin addict named Delana. (RT 483-484.) Two days later, Rodriguez went to the residence and was crying and hysterical. (RT 484.) Petitioner asked Rodriguez to leave. (RT 489.) As Rodriguez was leaving she hit Petitioner's car with her car. (RT 486-487.)

At the end of February, 2001, Petitioner went to Reno to stay with his sister for a while. Specifically, he went to seek treatment for his drug habit and to prevent the trouble Rodriguez was causing for him in Modesto. (RT 488.)

On March 22, 2001, Rodriguez telephoned Petitioner and asked him to go over. (RT 494.) Petitioner decided to go see Rodriguez and as he was en route from Reno to Empire, he was stopped in Sacramento for speeding and was arrested on an outstanding assault warrant arising from the January 17, 2001, incident. (RT 493-496.) His car was impounded. (RT 494-496.) Rodriguez bailed Petitioner out of jail and paid $1,000 to redeem his car from impound. (RT 496-497.)

Petitioner moved back in with Rodriguez, however, things were the same, they were

arguing again.  (RT 498.)  In early April, 2001, Petitioner went to live with Delana again but returned to live with Rodriguez a short time later.  (RT 498-500.)  Petitioner woke one morning and found his car had suffered mechanical and body damage.  (RT 498-499.)  Petitioner testified that Rodriguez refused to let him drive her car to work.  (RT 500-501.)   Petitioner left Rodriguez and went to stay with various friends.  (RT 501-502.)

On May 9, 2001, Petitioner was walking from Steve Garcia's residence to Empire Liquor Store and as he walked past Rodriguez's residence, she accused him of breaking her car window.  (RT 507.)  Petitioner denied doing such.  (RT 507.)  Rodriguez accused Petitioner of lying and threw a beer can at him. (RT 508.)  Petitioner stated that he, "felt like hitting her, but I didn't, so I poked the speakers with the screwdriver." (RT 509.)  Rodriguez threatened to call the police, and Petitioner told her to go ahead since she assaulted him.  (RT 509.)

Petitioner stated that he was contacted by Deputy Williams as he was walking near the Sheriff's substation on South Abbie.  (RT 504-505, 510.)  Petitioner stated that he told the Deputy, "I was assaulted, and I want to make a citizen's arrest. . . . Shelly threw a beer at me." (RT 505.)  Petitioner and the Deputy went to Rodriguez's residence and ultimately told them that the matter would be referred to the DA.  (RT 506, 510-511.)

In late June, 2001, Petitioner pled guilty to the assault charge and was sentenced to serve 30 days in county jail.  (RT 512-513.)  He was scheduled to turn himself in on July 9, 2001.  (RT 513, 536-539.)  Petitioner subsequently returned to Reno and re-enrolled in the Methadone program.  (RT 513-514.)

Petitioner stated that sometime in the end of June, 2001, Rodriguez along with Ms. Knoll and an unknown male went to Reno to pick him up.  (RT 515-516, 526.)  Petitioner ingested some methamphetamine in the car.  (RT 516-517.)  After the two were together a couple of days, they began to argue so Petitioner went back to Modesto.  (RT 517.)

Petitioner returned to see his daughter.  Petitioner told Rodriguez that the drug trafficking had to stop, but she would not listen.  (RT 519-520.)  Petitioner stated that he was primarily concerned with a man named "Sergio" as he was Rodriguez's "[c]rank connection." (RT 521.) Petitioner stated he confronted Sergio and he denied selling any drugs to Rodriguez.  (RT 521-

522.)  Sergio walked away and went to another house in the area.  (RT 523.)

Subsequently, a man named Mark went to visit Rodriguez, Petitioner told him to leave.
Mark then stated, "I'll leave when my business is over."  (RT 523.)  Petitioner told him your
business is over right now.  (RT 523.)  When Mark did not leave, Petitioner pulled a knife out,
and he fled.  (RT 524.)  Rodriguez was upset and hysterical and got in her car and drove away.
(RT 526.)

Ms. Rodriguez returned about an hour later, and told Petitioner that she had to leave to
take care of some business.  (RT 526-527.)  Petitioner asked Rodriguez for a ride to the bus
station but she refused.  (RT 527.)  Petitioner then took Rodriguez's car and drove it to Modesto
where he sold some stereo equipment and CDs.  (RT 528.)  Petitioner then took that money and
bought himself a bus ticket to Reno.  (RT 528.)

When Petitioner was supposed to return to Modesto to serve his jail sentence, Rodriguez
bought him a bus ticket.  (RT 529-531.)  When Petitioner arrived at the bus station, a friend gave
him a ride to Rodriguez's residence.  (RT 531-532.)  Rodriguez was upset, and told Petitioner
that he could take his daughter and stay at a motel room.  (RT 532.)  Petitioner went to the park
and played with Rebecca.  (RT 533.)  Then they went to a motel room where they took a nap.
(RT 534.)

After he awoke from the nap, Petitioner called Rodriguez and asked her to come to the
motel room.  (RT 535.)  Rodriguez and Frankie joined Petitioner and Rebecca in the motel room.
The two were up all night smoking crank.  (RT 536.)

The next morning Petitioner was supposed to turn himself in to the jail.  However, he did
not have the necessary paperwork, and around 5 or 6 p.m., Rodriguez told Petitioner to forget
about it and try the next day.  (RT 537-538.)  Petitioner spent the night with Rodriguez.  (RT
539.)

On the morning of July 10, 2001, Manuel Chavez supplied Rodriguez with
methamphetamine which she used.  (RT 540-544, 609-611.)  Petitioner did not smoke any
methamphetamine that morning.  (RT 543-544.)

Rodriguez went to the store with Frankie and returned with a beer for herself and some

10

chips for Frankie.  When Petitioner asked for a beer, Rodriguez stated, "Why don't you . . . fucking go the store and get it yourself."  (RT 545.)  Petitioner took Rebecca to the store with him and he bought a beer and some animal crackers for Rebecca.  He then went back to Rodriguez's residence.  (RT 546-547.)  Petitioner admitted that he had a knife on his belt but denied having a knife sticking out of his pocket.  (RT 547.)

When Petitioner returned to Rodriguez's residence, Frankie tried to take some crackers from Rebecca, and Petitioner told him "no."  (RT 547-548.)  Petitioner sat on the floor and was playing with Rebecca while Frankie stood near by.  (RT 549.)  Petitioner subsequently gave Frankie some crackers and put Rebecca down on the floor where she played with some toys.  (RT 549-550.)

Petitioner then went into the bedroom where Rodriguez was putting on her makeup.  (RT 551.)  He lay on his stomach on the bed, watching her, and thought about their situation.  (RT 551, 621.)  He asked her if she had been thinking about the kids?  (RT 551.)  She replied, "I fucking always think about my kids."  (RT 551.)  Petitioner stated that after he got out of jail, he wanted to start a new life with the children in Reno.  (RT 551.)  Rodriguez stated she wanted to move to Las Vegas.  (RT 552.)  Petitioner asked Rodriguez if he could take Rebecca with him after he got out of jail, and Petitioner replied, "The last fucking thing I need is another fucking lecture of yours."  (RT 553.)

Petitioner then stated that he snapped.  Petitioner stood up and slapped Rodriguez three times in the back of the head.  (RT 553.)  Petitioner claimed that the "next thing I know, I was poking her with my knife, like, barely trying to hit her shoulder."  (RT 553.)  Petitioner claimed that he was merely trying to "scare" Rodriguez and to impart upon her that everything he was trying to tell her was for his daughter's well being.  (RT 553.)  Petitioner stated that the stabbing occurred very fast.  (RT 554.)  He denied that he told Rodriguez that he would kill her before he stabbed her.  (RT 631, 632.)

Rodriguez picked up her daughter, went outside, lost her balance, and fell with her daughter on top of her.  (RT 554-556, 558.)  Petitioner grabbed a pillow to put under her head.  Then he remembered that moving an accident victim makes things worse.  He picked up

11

1 | Rebecca.  (RT 556, 558, 563.)

2 |     Petitioner yelled for neighbors to call 911.  (RT 556, 558-559.)  He told Rodriguez,

3 | "Please don't die.  Breathe, Shelly.  Please don't die.  Please don't die."  (RT 558-559.)

4 | Petitioner went back inside the residence to look for a cellular phone, but could not find it.  (RT

5 | 559-560.)  Petitioner became scared so he threw his knife away outside.  (RT 560.)  Petitioner

6 | went back to where Rodriguez's was lying and thought that she had died so he closed her eyelids.

7 | (RT 560.)  Petitioner then went to Mr. Garcia's residence and asked for a cigarette.  (RT 561.)

8 | Ms. Britt told Petitioner she had called 911.  (RT 561.)  Then within a few minutes the

9 | ambulance arrived and people started gathering.  (RT 562.)

10 |     Petitioner admitted that he told the Sheriff's deputy that he did not know what happened.

11 | (RT 562.)  Petitioner claimed that he "was scared.  I hurt Shelly, and I was frightened.  I froze."

12 | (RT 562.)  Petitioner told Deputies that he may have had an outstanding warrant because he was

13 | supposed to surrender.  (RT 562.)

14 |     Petitioner told Detective Woods that he had already told an officer what happened and he

15 | did not want to speak.  (RT 566.)

16 |     Petitioner denied ever poking Rodriguez with the hypodermic needle and denied chasing

17 | her with a crescent wrench.  (RT 566-567, 592-593, 673.)

18 |     Ann Burns, a substance abuse counselor at the Reno Treatment Center, testified that she

19 | first met Petitioner on March 13, 2001, when he inquired about starting a detox program.  (RT

20 | 681.)  Petitioner told Burns that he had been regularly using heroin for four months.  RT 681.)

21 | Petitioner enrolled in the program and participated until March 27, 2001, when he left.  (RT 682.)

22 | Petitioner re-enrolled on May 31, 2001, and participated until June 28, 2001, when he again left

23 | the program.  (RT 682-683.)  She next saw Petitioner on July 2, 2001, and he appeared to be

24 | "somewhat low."  (RT 685.)

25 |     It was Ms. Burns opinion that individuals who are recovering from an addiction to

26 | methamphetamine "are usually somewhat paranoid, suspicious, suicidal possibly."  (RT 687.)

27 | Also, such individuals tend to be anxious and impulsive.  (RT 687-688.)

28 | ///

1              DISCUSSION

2  A.    Jurisdiction

3        Relief by way of a petition for writ of habeas corpus extends to a person in custody

4  pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

5  or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

6  529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

7  violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

8  out of the Stanislaus County Superior Court, which is located within the jurisdiction of this

9  Court.  28 U.S.C. § 2254(a); 2241(d).

10       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

11 of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

12 enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

13 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

14 Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

15 1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

16 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

17 petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

18 B.    Standard of Review

19       This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

20 custody pursuant to the judgment of a State court only on the ground that he is in custody in

21 violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

22       The AEDPA altered the standard of review that a federal habeas court must apply with

23 respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

24 Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

25 will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

26 to, or involved an unreasonable application of, clearly established Federal law, as determined by

27 the Supreme Court of the United States;" or "resulted in a decision that was based on an

28 unreasonable determination of the facts in light of the evidence presented in the State Court

13

proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations omitted).  "Rather, that application must be objectively unreasonable."  Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.     Jury Instructions Regarding Express Malice and Premeditation and Deliberation

Petitioner contends that the trial court's instructions defining the elements of first degree murder were prejudicially misleading.  Specifically, Petitioner alleges that the trial court's instructions, CALJIC Nos. 8.11 (defining express malice) and 8.20 (defining premeditation and deliberation), when combined with the prosecutor's closing argument, impermissibly confused the concepts of express malice and premeditation.  (Sec. Amd. Pet. at 5.)

1.     Procedural Default

The Court of Appeal first noted that Petitioner's instant claim was waived by failing to object during trial, citing People v. Guiuan, 18 Cal.4th 558, 570 (1998) ("Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the part has requested appropriate clarifying or amplifying language.") (quoting People v. Andrews, 49 Cal.3d 200, 218 (1989)).  (Respondent's Exhibit A,

14

Opinion, at 4.)  Thus, the Court of Appeal found that Petitioner's instructional error claim

defining the elements of first degree premeditated and deliberate murder was waived due to

defense counsel's failure to seek amplification or clarification of the instructions at issue.  (Id.)

The Court alternatively reviewed the merits of the claim "in anticipation of the inevitable claim

of ineffective assistance of counsel."  (Id.)

A federal court will not review a petitioner's claims if the state court has denied relief of

those claims pursuant to a state law that is independent of federal law and adequate to support the

judgment.  Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Coleman v. Thompson, 501 U.S. 722,

729-30 (1989); See also Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935).  In such a case,

Petitioner is deemed to have procedurally defaulted his claims.  This doctrine of procedural

default is based on concerns of comity and federalism. Coleman, 501 U.S. at 730-32.

A claim is procedurally defaulted for federal habeas purposes if the state court relies on

state procedural grounds to deny relief.  Coleman v. Thompson, 501 U.S. 722, 729 (1991).

However, the state court's decision must "clearly and expressly state [ ] that its judgment rests on

a state procedural bar."  Harris v. Reed, 489 U.S. 255, 263 (1989).   If a state court reaches the

merits of a federal claim in the alternative, federal review is barred "as long as the state court

explicitly invokes a state procedural bar rule as a separate basis for decision."  Harris, 489 U.S. at

264 n. 10; see also Loveland v. Hatcher, 231 F.3d 640, 643-44 (9th Cir. 2000).  If it is unclear

whether the state court invoked a procedural bar or denied the merits of the claim, a federal court

may review the merits of the claim.  Loveland, 231 F.3d at 643-44; Siripongs v. Calderon, 35

F.3d 1308, 1317 (9th Cir.1994).   "A state court's application of a procedural rule is not

undermined where . . . the state court simultaneously rejects the merits of the claim."  Bennett v.

Mueller, 322 F.3d 573, 580 (9th Cir. 2003).

In addition, a federal court may only impose a procedural bar on claims if the procedural

rule that the state used to deny relief is "firmly established and regularly followed."  O'Dell v.

Thompson, 502 U.S. 995, 998, 112 S.Ct. 618, 620 (1991) (statement of Blackmun joined by

Stevens and O'Connor respecting the denial of certiorari); Ford v. Georgia, 498 U.S. 411,

423-24, 111 S.Ct. 850, 857 (1991); James v. Kentucky, 466 U.S. 341, 348-51, 104 S.Ct. 1830,

1835-37 (1984); <u>Fields v. Calderon</u>, 125 F.3d 757, 760 (9th Cir. 1997); <u>Calderon v. United States</u>

<u>Dist. Court (Bean)</u>, 96 F.3d 112, 129 (9th Cir. 1996), *cert. denied,* 117 S.Ct. 1569.  A federal

court may still consider a procedurally defaulted claim if the petitioner can demonstrate (1) cause

for the default and actual prejudice resulting from the alleged violation of federal law, or (2) a

fundamental miscarriage of justice.  <u>Harris</u>, *supra*, 489 U.S. 260, 262, 109 S.Ct. 1038 (1989).

In <u>Bennett</u>, the Ninth Circuit found that California's rule of timeliness is "independent"

of federal law for purposes of applying procedural default. <u>Bennett</u>, 322 F.3d at 581.  Thus, it is

necessary to determine whether the procedural rule is "adequate." To be deemed adequate, the

state law ground for decision must be well-established and consistently applied. <u>Poland v.</u>

<u>Stewart</u>, 169 F.3d 573, 577 (9th Cir.1999) ( "A state procedural rule constitutes an adequate bar

to federal court review if it was 'firmly established and regularly followed' at the time it was

applied by the state court."), *quoting* <u>Ford v. Georgia</u>, 498 U.S. 411, 424 (1991).

The Ninth Circuit has stated that the ultimate burden of proving the adequacy of the

California state bar is upon the State. <u>Bennett</u>, 322 F.3d at 585-86.  However, the burden shifts to

the petitioner to place that defense in issue once the state has adequately pled the existence of an

independent and adequate state procedural ground as an affirmative defense. <u>Id</u>. Petitioner "may

satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the

state procedure, including citation to authority demonstrating inconsistent application of the rule.

Once having done so, however, the ultimate burden is the state's." <u>Id</u>.

The Ninth Circuit has held that California's contemporaneous objection rule, which

requires objection at the time of trial to preserve an issue for appeal, is an adequate procedural

bar.  The contemporaneous objection rule is applied independent of federal law.  See <u>Vansickel</u>

<u>v. White</u>, 166 F.3d 953, 957-58 (9th Cir. 1999)(recognizing and applying California's

contemporaneous objection rule in affirming denial of a federal petition on the ground of

procedural default); <u>Rich v. Calderon</u>, 187 F.3d 1064, 1069-70 (9th Cir. 1999)("We may not

review his six other prosecutorial misconduct claims because Rich procedurally defaulted by

failing to make contemporaneous objections, and the California court consequently invoked a

procedural bar to their consideration, the validity of which Rich has failed to overcome); <u>Bonin</u>

v. Calderon, 59 F.3d 815, 842-43 (9th Cir. 1995)(sustaining the state court's finding of procedural default where defendant failed to make any objection at trial); Nevius v. Sumner, 852 F.2d 463, 470 (9th Cir. 1988) ("Errors at trial that are not preserved by contemporaneous objection and subsequent appeal to the state supreme court are barred in a collateral habeas corpus review, unless the petitioner can show cause and prejudice"); Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981), reversed on other grounds in Ross v. Oklahoma, 487 U.S. 81 (1988).  California courts have consistently applied the contemporaneous objection rule.  Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002) ("We held more than twenty years ago that the rule is consistently applied when a party has failed to make any objection to the admission of evidence."(citing Garrison v. McCarthy, 653 F.2d 374, 377 (9th Cir. 1981); Vanisckel v. White, 166 F.3d at 957-58; Bonin v. Calderon, 59 F.3d at 842-43.

     In this case, Respondent has adequately pled the existence of the procedural bar.  Although the California Court of Appeal, simultaneously addressed the merits of the claims, it independently determined that Petitioner waived the instructional error claim by failing to object at trial.[7]  Harris, 489 U.S. at 264 n. 10; see also Loveland v. Hatcher, 231 F.3d 640, 643-44 (9th Cir. 2000).  Therefore, the burden is on Petitioner to assert specific factual allegations that demonstrate the inadequacy of this bar.  Petitioner has not done so.  Accordingly, Petitioner's instructional error claim is procedurally defaulted.  Even if Petitioner had demonstrated the inadequacy of the bar, for the reasons explained below, there is no merit to Petitioner's claim.

          2.    Merits of Claim

     To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole

---

[7] Because the California Supreme Court's opinion is silent in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion.  See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000).

and the trial record. Id.  The court must evaluate jury instructions in the context of the overall

charge to the jury as a component of the entire trial process. See United States v. Frady, 456 U.S.

152, 169 (1982) (citing Henderson v. Kibbe,  431 U.S. 145, 154 (1977)).  Furthermore, even if it

is determined that the instruction violated the petitioner's right to due process, a petitioner can

only obtain relief if the unconstitutional instruction had a substantial influence on the conviction

and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113

S.Ct. 1710 (1993) (whether the error had a substantial and injurious effect or influence in

determining the jury's verdict.). See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).  The

burden of demonstrating that an erroneous instruction was so prejudicial that it will support a

collateral attack on the constitutional validity of a state court's judgment is even greater than the

showing required to establish plain error on direct appeal." Id.

_____The trial court instructed the jury with CALJIC No. 8.11 as follows:

> Malice may be either express or implied. [¶] Malice is express when there is manifested an intention unlawfully to kill a human being. [¶] Malice is implied when, one, the killing resulted from an intentional act; two, the natural consequences of the act are dangerous to human life; and, three, the act was deliberately performed with knowledge of the danger to and with conscious disregard for human life. [¶] When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought. [¶] The mental state constituting malice aforethought does not necessarily require any ill-will or hatred of the person killed. [¶] The word 'aforethought' does not imply deliberation or the lapse of considerable time.  It only means that the required mental state must precede rather than follow the act.

(RT 704-705; CT 162-163.)

The jury was instructed with CALJIC No. 8.20 as follows:

> All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree. [¶] The word 'willful,' as used in this instruction, means intentional. [¶] The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. [¶] The word 'premeditated' means considered beforehand. [¶] If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation so that it must have been formed upon preexisting reflection, not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder in the first degree. [¶] The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated.  The time will vary with different individuals and under varying circumstances.  The true test is not in the duration of time but, rather, the extent of

the reflection. [¶] A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it induces an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. [¶] To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill.

(RT 705-707; CT 164-165.)

As stated above, CALJIC 8.20 explains that premeditation means "considered beforehand" and deliberation means "careful thought and weighing of considerations for and against the proposed course of conduct." Under California law, "[a]ll murder which is perpetrated by any kind of willful, deliberate, and premeditated killing with express malice aforethought is murder of the first degree." CALJIC 8.20. Express malice aforethought as defined to the jury is a manifested intention to kill a human being unlawfully. As stated by the Court of Appeal, "[t]he instruction stated that it was unnecessary to find deliberation or a lapse of considerable time between the manifested intention of the actual killing. Instead, the jury was informed that express malice must precede, rather than follow, the act. This instruction correctly defines express malice. [citation.]" (Respondent's Exhibit A, at 5.)

Petitioner objects to the prosecutor's statement in closing argument told the jurors that a finding that the defendant thought about killing before the killing, even if it was immediately before, constituted premeditation and express malice. (RT 733-735, 755-756.) Petitioner also objects to the prosecutor's statement during closing argument that an announcement of an intention to kill during a situation which may involve provocation and/or heat of passion negates any possibility of manslaughter and establishes premeditation. (RT 822.) Petitioner further objects to the prosecutor's statement during closing that the same facts which establish express malice "are pretty much the same facts that you see in the premeditation and the deliberation of this murder." (RT 822.)

The Court fails to see how these instructions could be viewed as ambiguous as to the necessary finding for first degree murder, given the clear language contained within. Although both express malice and premeditation must be found to have been formed prior to the killing, this in no way infers that the jury confused the two concepts. Further, there is not a "reasonable

likelihood" the jury misconstrued the jury instructions in the manner Petitioner asserts. <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991).  As stated by the Court of Appeal, the prosecutor did not incorrectly state the law in her closing argument to the jury.  Petitioner "was free to argue that the facts did not support the prosecutor's argument and to point out why the prosecutor was wrong.  In fact his attorney did just that.  Simply because the jury found the prosecutor's argument more persuasive does not provide grounds for appeal." (Opinion, at 22.)  Further, as noted by the Court of Appeal, the jury was specifically instructed that the prosecutor's comments are neither evidence nor a statement of the law, but merely argument, and jurors are presumed to follow a court's admonitions and instructions.  <u>Romano v. Oklahoma</u>, 512 U.S. 1, 13 (1994).  Petitioner speculates that the giving of CALJIC 8.11 and 8.20, combined with the prosecutor's closing arguments impermissibly confused the concepts of express malice and premeditation.  To the contrary, the jury was properly instructed, and as discussed below given the strong evidence of Petitioner's guilt of first degree murder, Petitioner has failed to establish any resulting prejudice.  The instructions as given, and the prosecutor's comments in closing argument, were not confusing, and a reasonable jury would understand the distinction between premeditation and express malice.

D.    <u>Sufficient Evidence to Support Conviction of First Degree Murder</u>

Petitioner contends that there was insufficient evidence to support his conviction of first degree murder.  (Sec. Amd. Pet. at 5.)  Specifically, Petitioner contends that he did not premeditate the murder as he was mentally unstable as a result of cutting down on his use of methamphetamine and angry over Ms. Rodriguez's attempt to lecture him on good parenting.  Petitioner contends that Ms. Rodriguez died during a "heated sudden quarrel."  (Sec. Amd. Pet. at 5.)

The law on insufficiency of the evidence claim is clearly established.  The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).

1   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

2          Sufficient evidence supports Petitioner's conviction of first degree murder.  As stated by

3   the Court of Appeal, "there was evidence of the prior relationship between [Petitioner] and

4   Rodriguez from which the jury could infer a motive to kill the victim. . . .  The relationship

5   between the two was volatile. [Petitioner] was accused of throwing beer cans and a hot pan at her

6   and chasing her with a wrench. [Petitioner] admitted that whenever he spent extended periods of

7   time with Rodriguez they would argue. [Petitioner] threatened to stab Rodriguez on a previous

8   occasion and told her he was going to kill her before he stabbed her." (Respondent's Exhibit A,

9   Opinion, at 14.)  As stated by the Court of Appeal, ample facts exist to support the jury's finding

10  that Petitioner premeditated about the murder.  Specifically, he went to the liquor store and

11  bought himself a beer.  Not only did he have a knife clipped to his belt he also had a second knife

12  in his back pocket.  Petitioner proceeded the deadly attack by striking Rodriguez three times in

13  the back of head, then proceeded to threaten Rodriguez that he was going to kill her, which all

14  support an inference that he planned the murder.  Further, this was not a minimal attack.

15  Rodriguez was stabbed three times, two passed into the chest cavity, and one punctured the heart.

16  As stated by the Court of Appeal, "the jury reasonably could infer that [Petitioner's] intent was to

17  kill swiftly and was the result of deliberation and premeditation." (Respondent's Exhibit A,

18  Opinion, at 14.)  Thus, viewing the evidence in light most favorable to obtaining a conviction,

19  ample evidence supports the jury's finding that Petitioner premeditated and deliberated to

20  support a conviction for first degree murder.

21  E.    Constitutionality of CALJIC No. 2.50.02

22         Petitioner contends that CALJIC No. 2.50.02, informed the jury that if it found that

23  Petitioner committed the other acts of domestic violence beyond a reasonable doubt, it could

24  convict him of the charged crime with only this evidence.  (Sec. Amd. Pet. at 6.)  Petitioner

25  reasons the jury could find by a preponderance of the evidence that he committed the uncharged

26  domestic violence offenses against Ms. Rodriguez and from there infer he "did commit" the

27  charged murder.  (Sec. Amd. Pet. at 1.)

28         As explained above, to obtain federal collateral relief for errors in the jury charge, a

21

petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See id. at 72. Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. See United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)). Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996). The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Id.

As read to the jury CALJIC No. 2.50.02 stated:

> Evidence has been introduced for the purpose of showing that the defendant engaged in an offence involving domestic violence on one or more occasions other than that charged in the case.
> "Domestic violence" means abuse committed against an adult or a fully emancipated minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the defendant has a child or is having or has had a dating or engagement relationship. "Cohabitant" means two unrelated adult persons living together for a substantial period of time, resulting in some permanency of relationship. Factors that may determine whether persons are cohabiting include, but are not limited to, (1) sexual relations between the parties while sharing the same living quarters, (2) sharing of income or expenses, (3) join use or ownership of property, (4) whether the parties hold themselves out as husband and wife, (5) the continuity of the relationship, and (6) the length of the relationship.
> "Abuse" means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another.
> If you find that the defendant committed a prior offense involving domestic violence, you may, but are not required to, infer that the defendant had a disposition to commit another offense involving domestic violence. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime of which he is accused.
> *However, if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offense. If you determine an inference properly can be drawn from this*

*evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime.*

Unless you are otherwise instructed, you must not consider this evidence for any other purpose.

(CT 194-195; CALJIC 2.50.02 (2002 edition), emphasis added.)

In rejecting Petitioner's claim on direct appeal, the Court of Appeal held, in relevant part:

[Petitioner] concludes that the jury may have decided that if it found the prior acts of domestic violence true beyond a reasonable doubt, that finding was sufficient to find the charged crime true beyond a reasonable doubt.

Were we writing on a clean slate, we would reject this argument for a variety of reasons, including that the strained logic borders on absurd, the interpretation ignores the remainder of the instructions, and the argument suggests the jury is unable to comprehend and follow the instructions. We are not, however, writing on a clean slate.

This argument was rejected by the Supreme Court in *People v. Reliford* (2003) 29 Cal.4th 1007 in the context of CALJIC No. 2.50.01, which is utilized when the prior crimes involve sexual offenses.[8] The Supreme Court concluded, "no juror could reasonably interpret the instructions to authorize conviction of a charged offense based solely on proof of an uncharged sexual offense. It is not possible, for example, to find each element of the charged crimes, as the jury was instructed to do before returning a guilty verdict, based solely on the [prior sexual] offense. Nor is it possible to find a union or joint operation of act or conduct and the requisite intent for each charged crime, as the jury was also instructed to do. Hence, no reasonable jury could have been misled in this regard." (Reliford, at p. 1015.)

Supreme Court precedent binds us. (*Auto Equity Sale, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We also note that the instruction read to the jury includes the following cautionary instruction not included in Reliford: "If you determined an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all the other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt . . . ." This caution makes it virtually impossible for the instruction to be interpreted in the manner suggested by Torres.

(Respondent's Exhibit A, at 8-9.)

In Gibson v. Ortiz, 387 F.3d 812 (9th Cir. 2004), the Ninth Circuit Court of Appeals ruled that the pre-1999 version of CALJIC 2.50.01,[9] coupled with CALJIC 2.50.1, impermissibly lessened the standard of proof required to convict on the "sexual offenses" which were similar to the uncharged "sexual offenses." In 1999, California revised the standard jury instruction to

---

[8] The Supreme Court in *Reliford* reviewed the 1999 version of CALJIC No. 2.50.01. The trial court instructed with the 2002 version of CALJIC No. 2.50.02. However, the language at issue was the same in both instructions.

[9] CALJIC No. 2.50.01 is identical in all respects to CALJIC No. 2.50.02, expect that it applies to prior sexual offenses.

1  include the language italicized above.  People v. Reliford, 29 Cal.4th 1007, 1012 (2003).  As

2  Respondent correctly argues, the instruction given in this case is distinguishable from the version

3  of CALJIC No. 2.50.01 found constitutionally defective in Gibson.  Unlike in Gibson, the jury in

4  this case, was specifically told that the People had the burden of proving Petitioner guilty of the

5  charged crimes beyond a reasonable doubt and that the evidence of predisposition was merely

6  one of the items of proof that the jury could evaluate in assessing whether or not the prosecution

7  met its burden.  Thus, the revised version of CALJIC No. 2.50.02 did not undermine the jury's

8  responsibility to find each of the charged elements beyond a reasonable doubt.  As stated above,

9  the jury was specifically instructed that "if you find by a preponderance of the evidence that the

10  defendant committed a prior crime or crimes involving domestic violence, that is not sufficient

11  by itself to prove beyond a reasonable doubt that he committed the charged offense."  This

12  statement ensured that the "preponderance of the evidence" standard applied only to the prior

13  acts of domestic violence, and this finding did not relieve the prosecution of its burden to prove

14  "beyond a reasonable doubt" the elements of the charged offenses.

15      Moreover, in reviewing the jury instructions as a whole, the Court is persuaded that the

16  jury would not have been confused as to the burden of proof.  Specifically, the jury was read each

17  element of the crime of murder (CT 162) and given the definition of reasonable doubt and

18  instructed that the People had the burden of proving the defendant guilty beyond a reasonable

19  doubt (CT 158).  Further, the jury was instructed to "consider the instructions as a whole and

20  each in light of all the others."  (CT 149).  With regard to circumstantial evidence, the jury was

21  instructed that "each fact which is essential to complete a set of circumstances necessary to

22  establish the defendant's guilt must be proved beyond a reasonable doubt."  (CT 150.)

23      Accordingly, the giving of CALJIC No. 2.50.02 did not violate Petitioner's due process

24  rights and the state courts' determination is neither contrary to nor an unreasonable application of

25  Supreme Court authority.

26  F.   Constitutionality of California Evidence Code Section 1109

27      Petitioner contends that California Evidence Code section 1109 violates his rights to due

28  process and equal protection.  (Sec. Amd. Pet. at 2, 6.)  Petitioner contends that the statute

1   violates due process both on its face and as applied.  (Id.)

2       California Evidence Code section 1109 (2002 edition) states:

3           (a)(1) Except as provided in subdivision (e) or (F), in a criminal action in
            which the defendant is accused of an offense involving domestic violence,
4           evidence of the defendant's commission of other domestic violence is not made
            inadmissible by Section 1101 if the evidence is not inadmissible pursuant to
5           Section 352.

6                           1.    Due Process Violation

7       In United States v. LeMay, 260 F.3d 1018 (9th Cir. 2001), the Ninth Circuit considering

8   section 1108, rejected the argument that the traditional ban on the admission of propensity

9   evidence qualifies as a "fundamental" principle of justice, as it pertains to sex offenses, when the

10  court rejected a due process challenge to Federal Rules of Evidence 414.  Evidence Code section

11  1108 is the equivalent to section 1109, except it deals with propensity evidence relating to prior

12  sexual conduct versus domestic violence, and section 1109 is analogous to Federal Rules of

13  Evidence 403 and 414 which govern the admissibility of evidence of prior conduct in cases of

14  sexual assault and child molestation.  The Ninth Circuit concluded that Rule 414 did not violate

15  due process because Rule 403 (the federal equivalent to California Evidence Code section 352)

16  acts as a filter that results in the exclusion of evidence that is so prejudicial as to constitute a due

17  process violation.

18      Petitioner has failed to show that "the traditional ban on propensity evidence involves a

19  'fundamental conception of justice'" which is violated by Evidence Code section 1109.  See

20  LeMay, 260 F.3d at 1025.  Thus, Petitioner has failed to demonstrate that the admission of

21  propensity evidence violated due process.  Further, the state courts' determination of this issue

22  was not contrary to, or an unreasonable application of, clearly established Supreme Court

23  precedent.  There is no United States Supreme Court authority finding that the admission of

24  evidence of other crimes to prove propensity violates due process.  In fact, the Supreme Court has

25  expressed no opinion on the question whether the admission of evidence of other crimes solely to

26  prove propensity violates due process.  See Estelle, 502 U.S. at 75 n. 5 ["[W]e express no opinion

27  on whether a state law would violate the Due Process Clause if it permitted the use of 'prior

28  crimes' evidence to show propensity to commit a charged crime".]  As such, to date there is no

1   clearly established Supreme Court precedent forbidding the use of such evidence. Accordingly,

2   the petition for writ of habeas corpus on this claim must be denied.

3                  2.     <u>Equal Protection Violation</u>

4         The Supreme Court has held that the equal protection clause means "that no State shall

5   deny to any person within its jurisdiction the equal protection of the laws, which is essentially a

6   direction that all persons similarly situated should be treated alike." <u>City of Cleburne, Texas v.</u>

7   <u>Cleburne Living Center</u>, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985); <u>Clark v. California</u>, 123

8   F.3d 1267, 1270 (9th Cir. 1997). The first step in any equal protection analysis is to identify

9   petitioner's classification or group.  <u>Freeman v. City of Santa Ana</u>, 68 F.3d 1180, 1187 (9th Cir.

10  1995).  Petitioner must show that the law has been applied in a discriminatory manner on him or

11  imposes different burdens on different groups.  <u>Id.</u>; <u>Christy v. Hodel</u>, 857 F.2d 1324, 1331 (9th

12  Cir. 1988).  The second step requires the Court to determine the level of scrutiny with which the

13  Court should review the statute.  <u>Freeman</u>, 68 F.3d at 1187.  Discrimination on the basis of race or

14  national origin and discrimination that affects fundamental rights are subject to strict scrutiny.

15  <u>Clark v. Jeter</u>, 486 U.S. 456, 461, 108 S.Ct. 1910, 1914 (1988).  "The general rule is that

16  legislation is presumed to be valid and will be sustained if the classification drawn by the statute

17  is rationally related to a legitimate state interest.  <u>City of Cleburne v. Cleburne Living Center</u>, 473

18  at 440.  A heightened standard of review is applied only "when a statute classifies by race,

19  alienage, or national origin" or infringes on fundamental rights guaranteed by the Constitution.

20  <u>Id</u>. Petitioner's claim fails under both steps of the Equal Protection analysis. Defendants accused

21  of domestic violence and murder are not in a protected class, nor does section 1109 infringe on

22  any of Petitioner's fundamental rights.  Accordingly, the rational relationship standard applies.

23  Under rational relationship review, the governmental action challenged must be upheld unless it

24  bears no rational relationship to the government's goals.  <u>Id</u>.

25        As stated by the Court of Appeal, Petitioner's equal protection argument was rejected in

26  <u>People v. Jennings</u>, 81 Cal.App.4th 1301, 1313 (2000):

27           Like . . . sex crimes . . ., domestic violence is quintessentially a secretive
    offense, shrouded in private shame, embarrassment and ambivalence on the part of

28  the victim, as well as intimacy with and intimidation by the perpetrator.  The

special relationship between victim and perpetrator in both domestic violence and sexual abuse cases, with their unusually private and intimate context, easily distinguishes these offenses from the broad variety of criminal conduct in general. Although all criminal trials are credibility contests to some extent, this is unusually-even inevitably-so in domestic and sexual abuse cases, specifically with respect to the issue of victim credibility. The Legislature could rationally distinguish between these two kinds of cases and all other criminal offenses in permitting the admissibility of previous like offenses in order to assist in more realistically adjudging the unavoidable credibility contest between accuser and accused.

For the reasons outlined in <u>Jennings</u>, this Court too finds that there is a rational basis for the legislature's distinction between domestic abuse crimes and other crimes, and Petitioner's equal protection rights were not violated. The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

G.     Instructional Error - CALJIC No. 2.51

Petitioner contends that the trial court prejudicially erred by instructing the jury with CALJIC No. 2.51.[10] Specifically, Petitioner contends that instruction regarding motive inferred to the jury that it was to find a motive and that it was a genuine factor, not simply a possible factor**.** Petitioner contends that the jury may have confused motive with the necessary intent.

As previously stated, to obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See <u>Estelle v. McGuire</u>, 502 U.S. at 71-72. Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. <u>Id</u>. The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. <u>See</u> <u>United States v. Frady</u>, 456 U.S. 152, 169 (1982) (*citing* <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977)). Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice

---

[10]  As read to the jury, this instruction states: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance of this case. Presence of motive may tend to establish the defendant is guilty. Absence of motive may tend to show the defendant is not guilty." (RT 824; CT 205.)

under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).  The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal."  Id.

In rejecting Petitioner's claim on direct appeal, the Court of Appeal held:

[Petitioner] contends that the presence of motive does not tend to show guilt but may lead to an inference regarding identity.  He spends a great deal of effort parsing the instruction into single phrases or words and arguing that these words or phrases may mislead a jury.  We think this effort was wasted.

"'It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'" [Citations.]" (*People v. Wilson* (1992) 3 Cal.4th 926, 943.)  The issue is whether a reasonable jury would be misled by the instruction.  (*People v. Frye* (1998) 18 Cal.4th 894, 957.)

CALJIC No. 2.51 has been subjected to numerous attacks.  (See, e.g., *People v. Snow* (2003) 30 Cal.4th 43; *People v. Prieto* (2003) 30 Cal.4th 226; *People v. Cash* (2002) 28 Cal.4th 703; *People v. Hillhouse* (2002) 27 Cal.4th 469; *People v. Stanley*, *supra*, 10 Cal.4th at p. 764.) [Petitioner] does not cite any case in which the instruction was found erroneous.  We located only one, *People v. Maurer* (1995) 32 Cal.App.4th 1121.  *Maurer* considered the instruction in a section 647.6 prosecution, annoying or molesting a child.  To prove this crime, the People were required to establish that the conduct was motived by an unnatural or abnormal sexual interest in the minor.  (*Maurer*, at p. 1125.)  The appellate court held that since the defendant's motivation was an element of the crime in a section 647.6 prosecution, it was error to instruct the jury with CALJIC No. 2.51.  (*Maurer*, at p. 1127.)

This case obviously is distinguishable from *Maurer* because [Petitioner] was convicted of murder, not annoying or molesting a child.  Motive is not an element of the crime of murder.  (*People v. Hillhouse*, *supra*, 27 Cal4th at pp. 503-504.)  Therefore, there was no conflict between CALJIC No. 2.51 and the elements of the crime.

The cases cited by [Petitioner] are inapposite.  [Petitioner] cites *Hillhouse* and *Cash* for the proposition that in some situations instructing with CALJIC 2.51 is erroneous.  Both of these cases, however, upheld the use of the instruction.  The situations where the instruction was found erroneous referred to *Maurer*.  As explained above, *Maurer* is also inapposite.

[Petitioner] also argues that the jury may have confused motive and intent and substituted motive for the required intent because there was evidence of motive at a past time.[11]  Motive and intent are separate and disparate mental states, each accurately defined by the instructions.  (*People v. Hillhouse*, *supra*, 27 Cal.4th at p. 504.)  Motive is the reason a person chooses to commit a crime, not the mental state (such as intent) required when the crime is committed.  (*People v.*

---

[11] Presumably, [Petitioner] is referring to the evidence of prior instances of domestic violence.  Unfortunately, [Petitioner's] brief fails to identify the past instances of motive.

28

1  *Cash*, *supra*, 28 Cal.4th at p. 738.)  Since the instructions did not use the terms
2  "motive" and "intent" interchangeably, it is not reasonably likely the jury
   understood the terms to be interchangeable.  (*Id*. at p. 739.)

3  (Respondent's Exhibit A, Opinion, at 10-11.)

4       The California Court of Appeal's adjudication of this claim was not contrary to, or an

5  unreasonable application of, clearly established federal law.  Simply stated, evidence of motive is

6  not required to establish an intent to kill.  The intent element of murder, i.e. express malice was

7  defined to the jury as a manifested intention to unlawfully kill a human being.  (CT 163; CALJIC

8  8.11.)  As correctly stated by the Court of Appeal, motive and intent are separate mental states, and

9  each was accurately and separately defined by the instructions.  The state court reasonably held

10 that the instructions did not use the terms interchangeably, and it is therefore not reasonably likely

11 the jury understood the terms to be interchangeable.  The instruction was the standard motive

12 instruction, unambiguously stating that motive was not an element of the crime and that it need

13 not be shown.  Therefore, irrespective of whether the jury found any motive, it still could have

14 found all the elements of first degree murder, including the necessary intent beyond a reasonable

15 doubt.  The motive instruction does not deal with the burden of proof, but only one circumstance

16 which may be considered by the jury.  In fact, during closing argument the prosecutor reinforced

17 the fact that malice was not an element of the offense and need not be proven.[12]  (RT 740-741.)  It

18 does not dilute the burden of proof, especially where, as here, the jury was properly instructed on

19 the elements of the crime, on the prosecution's burden of proof, and on the proper use of the

20 inferences and circumstantial evidence.  Specifically, the jury was instructed with the following

21 instructions: CALJIC No. 2.90 told the jury that the People had to establish guilt beyond a

22 reasonable doubt; CALJIC No. 1.01 told the jury to consider the instructions as a whole; and

23 CALJIC No. 2.01 told the jury that when evaluating circumstantial evidence ". . . before an

24 inference essential to establish guilt may be found to have been proved beyond a reasonable

25 doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a

26 reasonable doubt"; CALJIC No. 8.11 explained to the jury the definition of malice aforethought

27

28      [12]  The prior instances of domestic violence provided a basis for the prosecutor to argue that Petitioner had a
   desire for revenge and punishment.  (RT 741.)

necessary for murder; CALJIC No. 8.20 explained the definition of first degree murder to the jury which includes premeditation and deliberation; and CALJIC 3.31 told the jury that there must exist a union or joint operation of act or conduct and a specific intent in the mind of the defendant. (CT 149, 150, 158, 163, 164-165, 202.)  These instructions as a whole clearly required the jury to find the necessary intent, which clearly did not include the finding that Petitioner had a particular motive.  Accordingly, Petitioner's claim fails on the merits.

H.     Prosecutorial Misconduct

Petitioner contends that the prosecutor committed prejudicial misconduct by making certain remarks in her closing argument.  Specifically, Petitioner alleges that the prosecutor said, that premeditation "basically just means that you went through that thought process before you committed the act or you decided to commit."  (Sec. Amd. Pet. at 2-3; RT 734.)  Petitioner also takes issue with the prosecutor's assertion that "whenever you've decided to do something, you say you are going to do it, you are announcing your intention, or you decide even that you're going to do something, you have already premeditated and thought about it."  (Id.; RT 754-755.) Petitioner also contends that the prosecutor urged the jury to find him guilty based on her view that he did not display sufficient remorse after the fact.  (Id. at 2-3.)

1.     Procedural Default

The Court of Appeal first noted that Petitioner's instant claim was waived by failing to object during trial, citing People v. Guiuan, 18 Cal.4th 558, 570 (1998). (Respondent's Exhibit A, Opinion, at 4.)  The Court alternatively reviewed the merits of the claim "to resolve the claim of ineffective assistance of counsel."  (Id.)

In order to preserve a claim of prosecutorial misconduct for appeal, the appellant must make a timely objection and request the court to admonish the jury.  People v. Berryman, 6 Cal.4th 1048, 1072 (1993); People v. Price, 1 Cal.4th 324, 447 (1991).  "Generally, in order to raise the alleged misconduct on appeal, the objection must be both timely and specific. [Citation.] Moreover, when defense counsel objects during trial but does not request an appropriate instruction or admonition in order to lessen the possible prejudicial effect on the jury, the asserted objection is waived for purposes of appeal. [Citation.]" People v. Pitts, 223 Cal.App.3d 606, 691-

692 (1990).

A federal court will not review a petitioner's claims if the state court has denied relief of those claims pursuant to a state law that is independent of federal law and adequate to support the judgment.  Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Coleman v. Thompson, 501 U.S. 722, 729-30 (1989); See also Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935).  In such a case, Petitioner is deemed to have procedurally defaulted his claims.  This doctrine of procedural default is based on concerns of comity and federalism. Coleman, 501 U.S. at 730-32.

A claim is procedurally defaulted for federal habeas purposes if the state court relies on state procedural grounds to deny relief.  Coleman v. Thompson, 501 U.S. 722, 729 (1991). However, the state court's decision must "clearly and expressly state [ ] that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989).  If a state court reaches the merits of a federal claim in the alternative, federal review is barred "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision." Harris, 489 U.S. at 264 n. 10; see also Loveland v. Hatcher, 231 F.3d 640, 643-44 (9th Cir. 2000).  If it is unclear whether the state court invoked a procedural bar or denied the merits of the claim, a federal court may review the merits of the claim.  Loveland, 231 F.3d at 643-44; Siripongs v. Calderon, 35 F.3d 1308, 1317 (9th Cir.1994).  "A state court's application of a procedural rule is not undermined where . . . the state court simultaneously rejects the merits of the claim." Bennett v. Mueller, 322 F.3d 573, 580 (9th Cir. 2003).

In addition, a federal court may only impose a procedural bar on claims if the procedural rule that the state used to deny relief is "firmly established and regularly followed." O'Dell v. Thompson, 502 U.S. 995, 998, 112 S.Ct. 618, 620 (1991) (statement of Blackmun joined by Stevens and O'Connor respecting the denial of certiorari); Ford v. Georgia, 498 U.S. 411, 423-24, 111 S.Ct. 850, 857 (1991); James v. Kentucky, 466 U.S. 341, 348-51, 104 S.Ct. 1830, 1835-37 (1984); Fields v. Calderon, 125 F.3d 757, 760 (9th Cir. 1997); Calderon v. United States Dist. Court (Bean), 96 F.3d 112, 129 (9th Cir. 1996), cert. denied, 117 S.Ct. 1569.  A federal court may still consider a procedurally defaulted claim if the petitioner can demonstrate (1) cause for the default and actual prejudice resulting from the alleged violation of federal law, or (2) a

31

1   fundamental miscarriage of justice.  <u>Harris</u>, *supra*, 489 U.S. 260, 262, 109 S.Ct. 1038 (1989).

2          In <u>Bennett</u>, the Ninth Circuit found that California's rule of timeliness is "independent" of

3   federal law for purposes of applying procedural default. <u>Bennett</u>, 322 F.3d at 581.  Thus, it is

4   necessary to determine whether the procedural rule is "adequate." To be deemed adequate, the

5   state law ground for decision must be well-established and consistently applied. <u>Poland v.</u>

6   <u>Stewart</u>, 169 F.3d 573, 577 (9th Cir.1999) ( "A state procedural rule constitutes an adequate bar to

7   federal court review if it was 'firmly established and regularly followed' at the time it was applied

8   by the state court."), *quoting* <u>Ford v. Georgia</u>, 498 U.S. 411, 424 (1991).

9          The Ninth Circuit has stated that the ultimate burden of proving the adequacy of the

10  California state bar is upon the State. <u>Bennett</u>, 322 F.3d at 585-86.  However, the burden shifts to

11  the petitioner to place that defense in issue once the state has adequately pled the existence of an

12  independent and adequate state procedural ground as an affirmative defense. <u>Id</u>. Petitioner "may

13  satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the

14  state procedure, including citation to authority demonstrating inconsistent application of the rule.

15  Once having done so, however, the ultimate burden is the state's." <u>Id</u>.

16         The Ninth Circuit has held that California's contemporaneous objection rule, which

17  requires objection at the time of trial to preserve an issue for appeal, is an adequate procedural bar.

18  The contemporaneous objection rule is applied independent of federal law.  <u>See</u> <u>Vansickel v.</u>

19  <u>White</u>, 166 F.3d 953, 957-58 (9th Cir. 1999)(recognizing and applying California's

20  contemporaneous objection rule in affirming denial of a federal petition on the ground of

21  procedural default); <u>Rich v. Calderon</u>, 187 F.3d 1064, 1069-70 (9th Cir. 1999)("We may not

22  review his six other prosecutorial misconduct claims because Rich procedurally defaulted by

23  failing to make contemporaneous objections, and the California court consequently invoked a

24  procedural bar to their consideration, the validity of which Rich has failed to overcome); <u>Bonin</u> <u>v.</u>

25  <u>Calderon</u>, 59 F.3d 815, 842-43 (9th Cir. 1995) (sustaining the state court's finding of procedural

26  default where defendant failed to make any objection at trial); <u>Nevius v. Sumner</u>, 852 F.2d 463,

27  470 (9th Cir. 1988) ("Errors at trial that are not preserved by contemporaneous objection and

28  subsequent appeal to the state supreme court are barred in a collateral habeas corpus review,

unless the petitioner can show cause and prejudice"); Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981), reversed on other grounds in Ross v. Oklahoma, 487 U.S. 81 (1988).  California courts have consistently applied the contemporaneous objection rule.  Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002) ("We held more than twenty years ago that the rule is consistently applied when a party has failed to make any objection to the admission of evidence."(citing Garrison v. McCarthy, 653 F.2d 374, 377 (9th Cir. 1981); Vanisckel v. White, 166 F.3d at 957-58; Bonin v. Calderon, 59 F.3d at 842-43.

In this case, Respondent has adequately pled the existence of the procedural bar.  Although the California Court of Appeal, simultaneously addressed the merits of the claims, it independently determined that Petitioner waived the claim of prosecutorial misconduct by failing to object at trial.[13]  Harris, 489 U.S. at 264 n. 10; see also Loveland v. Hatcher, 231 F.3d 640, 643-44 (9th Cir. 2000).  Therefore, the burden is on Petitioner to assert specific factual allegations that demonstrate the inadequacy of this bar.  Petitioner has not done so.  Accordingly, Petitioner's prosecutorial misconduct claim is procedurally defaulted.  Even if Petitioner had demonstrated the inadequacy of the bar, for the reasons explained below, there is no merit to Petitioner's claim.

### 2.  Merits

A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 171, 106 S.Ct. 2464 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871 (1974)); see Bonin v. Calderon, 59 F.3d 815, 843 (9th Cir. 1995).  To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765, 107 S.Ct. 3102, 3109 (1987) (quoting United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375 (1985)). Under this standard, a petitioner must show that there is a

---

[13]  Because the California Supreme Court's opinion is silent in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000).

reasonable probability that the error complained of affected the outcome of the trial - i.e., that

absent the alleged impropriety, the verdict probably would have been different.  A prosecutor may

make inferences during closing argument that is based on the evidence in the record; however, he

cannot misstate or exceed the evidence in any significant respect. United States v. Marques, 600

F.2d 742, 749 (9th Cir. 1979).

In rejecting Petitioner's claim, the Court of Appeal stated:

> In a continuation of his instructional error argument, [Petitioner] claims that
> the prosecutor committed misconduct during closing argument by confusing the
> issues of express malice and premeditation.  We have reviewed the prosecutor's
> closing argument.  We also have reviewed the passages cited by [Petitioner].  We
> have not identified any deceptive or reprehensible methods used by the prosecutor
> to persuade the jury.  Nor is there any possibility the jury understood or applied the
> complained-of comments in an improper manner.
>
> Both attorneys made it clear in closing argument that the only issue at trial
> was whether [Petitioner] acted with deliberation and premeditation. [Petitioner]'s
> counsel argued that [Petitioner] acted in a heat of passion and, at most, was guilty
> of voluntary manslaughter.  The prosecutor correctly stated the law in closing and
> argued that she believed the evidence supported a verdict of first degree murder.
> We could not find, and [Petitioner] does not identify, any incorrect statement of the
> law by the prosecutor.
>
> [Petitioner]'s complaint can be reduced to this - - it was unfair for the
> prosecutor to rely on the same facts to establish both express malice and premeditation.  We reject
> this complaint as unsupported by law and commonsense. [Petitioner] was free to argue that the
> facts did not support the prosecutor's argument and to point out why the prosecutor was wrong.
> In fact, his attorney did just that.  Simply because the jury found the prosecutor's argument more
> persuasive does not provide grounds for appeal.
>
> The trial court instructed the jury on the correct legal principles and
> informed the jury that any conflict between the law provided by the trial court and
> the attorneys' statements of the law must be resolved by reference to the trial
> court's instructions.  The jury was provided with a copy of the instructions while it
> deliberated.  The prosecutor correctly stated these same principles in closing.
> There was no misconduct.
> .......................................
> [Petitioner] next complains the prosecutor tried to shift the burden of proof
> to the defense during closing argument when she stated, "You have to have some
> doubt that's based on reason, a reasonable doubt, because anything is possible."
> According to [Petitioner], this statement informed the jury that it must be able to
> articulate reasons in support of their doubt before it could be reasonable doubt.
>
> It is impossible to interpret this statement in the manner suggested by
> [Petitioner].  The prosecutor paraphrased, in part, CALJIC No. 2.90.  This
> instruction defines reasonable doubt, as "not a mere possible doubt; because
> everything relating to human affairs is open to some possible or imaginary doubt."
> There is no basis to complain about the prosecutor's comment.
> ....................................
> [Petitioner] next complains that the prosecutor twice stated in closing
> argument that to find him guilty of manslaughter, the jury would have to find he
> acted without malice.  According to [Petitioner], the prosecutor shifted the burden
> of proof to [Petitioner] to establish a lack of malice.
>
> Once again, we disagree.  The prosecutor was stating to the jury the correct

legal distinction between murder and manslaughter. To find manslaughter, the jury must conclude that the prosecution failed to prove that the defendant acted with malice.  If malice is present, the crime must be either first or second degree murder.

     While the prosecutor, perhaps, could have been a little more accurate in her phrasing, there was no misconduct.  There is no evidence the jury was misled by these comments, and we conclude that no reasonable jury could have been misled by these comments.

...................................

     [Petitioner] also asserts that the prosecutor's comments about his lack of remorse constituted misconduct.  Once again, we think otherwise.

     "Unless a defendant opens the door to the matter in his or her case-in-chief [citations], his or her remorse is irrelevant at the guilt phase."  (People v. Jones (1998) 17 Cal.4th 279, 307.)  During the presentation of the People's case, the prosecutor asked about [Petitioner]'s demeanor immediately after the stabbing. There were no questions about remorse.  When [Petitioner] testified, he claimed he acted in a heat of passion, which theoretically opened the door for testimony about remorse.  The People did not call any rebuttal witnesses on the issue of remorse, instead relying on demeanor testimony already received to argue there was no remorse.

     [Petitioner]'s demeanor after the stabbing, described by the witnesses as very stoic or very cool, which include initial denials of involvement in the stabbing, were inconsistent with the claim of heat of passion.  The prosecutor was entitled to comment upon this demeanor in closing. There was no misconduct.

(Respondent's Exhibit A, Opinion, at 21-25, footnote omitted.)

For the reasons stated by the Court of Appeal, this Court too finds that the prosecutor did not engage in misconduct during closing argument. A thorough review of the record convinces the Court that the prosecutor's comment was neither dispositive nor an incorrect statement of the evidence or law.  Nor has Petitioner demonstrated or this Court found that any of the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181, *quoting*, Donnelly, 416 U.S. 637 (1974).  The state court's resolution of Petitioner's claim of prosecutorial misconduct was not contrary to and did not involve an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States. The claim must be denied.

I.   Eighth Amendment - Restitution Fine

Petitioner contends that the trial court's imposition of a $10,000 restitution fine, the statutory maximum, violated the prohibition against excessive fines.  (Sec. Amd. Pet. at 3.)

In rejecting Petitioner's claim, the Court of Appeal held:

     [Petitioner] relies on *U.S. v. Bajakajian* (1998) 524 U.S. 321 where the Supreme Court held that the Eighth Amendment is violated when a punitive fine is

"grossly disproportional to the gravity of a defendant's offense." (*Id.* at p. 334.) The fine held to violate the Eighth Amendment was $337,144 for failing to declare the amount of currency being taken out of the country. (*Id.* at p. 324.)

Section 1202.4, subdivision (b)(1) provides the maximum restitution fine that may be imposed is $10,000 for a felony and provides a formula for determining the amount of the fine: $200 for each year of incarceration. The trial court has wide discretion in determining the amount of a restitution fine. (*Ibid.*; *People v. Gangemi* (1993) 13 Cal.App.4th 1790, 1798.)

The trial court followed the statutory formula in imposing [Petitioner's] $10,000 restitution fine. [Petitioner] was convicted of first degree murder, not failing to declare the amount of currency taken out of the country. The fine is $10,000, not over $300,000. Bajakajian is irrelevant. The gravity of the offense amply supports the fine. This fine does not violate either the state or federal Constitutions.

(Respondent's Exhibit A, Opinion, at 24.)

The Eighth Amendment to the United States Constitution reads: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." This prohibition is applicable to the states by virtue of its incorporation in the due process clause of the Fourteenth Amendment. Robinson v. California, 370 U.S. 660, 675 (1962), conc. opn. of Douglas J. A fine is unconstitutionally excessive if (1) the payment to the government constitutes punishment for an offense, and (2) the payment is grossly disproportionate to the gravity of the defendant's offense. United States v. Bajakajian, 524 U.S. 321, 327-328 (1998).

Article I, § 28, subdivision (b), of the California Constitution provides:

Restitution. It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer.

Restitution shall be ordered from the convicted persons in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss, unless compelling and extraordinary reasons exist to the contrary. The Legislature shall adopt provisions to implement this section during the calendar year following adoption of this section.

Section 1202.4 provides, in relevant part:

(a)(1) It is the intent of the Legislature that a victim of crime who incurs any economic loss as a result of the commission of a crime shall receive restitution directly from any defendant convicted of that crime.

(2) Upon a person being convicted of any crime in the State of California, the court shall order the defendant to pay a fine in the form of a penalty assessment in accordance with Section 1464.

(3) The court, in addition to any other penalty provided or imposed under the law, shall order the defendant to pay both of the following:

36

(A) A restitution fine in accordance with subdivision (b).

(B) Restitution to the victim or victims, if any, in accordance with subdivision (f), which shall be enforceable as if the order were a civil judgment.

(b) In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record.

(1) The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense, but shall not be less than two hundred dollars ($200), and not more than ten thousand dollars ($10,000), if the person is convicted of a felony, and shall not be less than one hundred dollars ($100), and not more than one thousand dollars ($1,000), if the person is convicted of a misdemeanor.

(2) In setting a felony restitution fine, the court may determine the amount of the fine as the product of two hundred dollars ($200) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted.

(c) The court shall impose the restitution fine unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record. A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine. Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the two-hundred-dollar ($200) or one-hundred-dollar ($100) minimum.

(d) In setting the amount of the fine pursuant to subdivision (b) in excess of the two-hundred-dollar ($200) or one-hundred-dollar ($100) minimum, the court shall consider any relevant factors including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, and the number of victims involved in the crime. Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime. Consideration of a defendant's inability to pay may include his or her future earning capacity. A defendant shall bear the burden of demonstrating his or her inability to pay. Express findings by the court as to the factors bearing on the amount of the fine shall not be required. A separate hearing for the fine shall not be required.

Given the severity of the nature of Petitioner's murder conviction and his sentence of 25 years to life, doubled pursuant to section 667, subdivision (e)(1), the state courts' determination that the imposition of the $10,000 restitution fine was not excessive is neither contrary to nor an unreasonable application of controlling federal authority.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.   The second amended petition for writ of habeas corpus should be DENIED; and

2.    The Clerk of Court be directed to enter judgment in favor of Respondent.

These Findings and Recommendations are submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the

Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


        IT IS SO ORDERED.

    **Dated:    July 19, 2006**                      **/s/ Dennis L. Beck**
3b142a                                         UNITED STATES MAGISTRATE JUDGE